IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BLUEFIELD DIVISION

DAVID ALLEN ROWE,                    )
                                     )
        Petitioner,                  )
                                     )
v.                                   )          CIVIL ACTION NO. 1:07-0283
                                     )
DAVID BALLARD, Warden,               )
Mount Olive Correctional Complex,    )
                                     )
        Respondent.                  )

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court are the following Motions: (1) Respondent's Motion for Summary Judgment (Document No. 24.), filed on June 29, 2009, by Silas B. Taylor, Assistant Attorney General; and (2) Petitioner's Motion for Summary Judgment (Document No. 80.), filed on July 16, 2012, by counsel, Thomas J. Gillooly. Petitioner filed his Response to Respondent's Motion for Summary Judgement on July 16, 2012. (Document No. 79.) On September 10, 2012, Respondent filed his "Response/Reply Memorandum in Opposition to Petitioner's Motion for Summary Judgment and in Support of Respondent's Motion for Summary Judgment." (Document No. 87.) Petitioner filed his Reply on October 1, 2012. (Document No. 90.) Having thoroughly examined the record in this case, the undersigned respectfully recommends that the District Court grant Respondent's Motion for Summary Judgment and deny Petitioner's Motion for Summary Judgment.

## PROCEDURAL HISTORY

On June 11, 2003 the Grand Jury of Mercer County, West Virginia, returned an Indictment against Petitioner, charging him with 16 counts of "Sexual Abuse by a Guardian" in violation of West Virginia Code § 61-8D-5(a). State v. Rowe, Criminal Action No. 03-F-186 (Cir. Ct. Mercer

Co. Feb. 23, 2004). (Document No. 24-1, Exhibit 1, pp. 1 - 4.) Following a jury trial conducted on January 21 - 23, 2004, Petitioner was convicted of four counts (Counts 13 - 16.) of "Sexual Abuse by a Guardian." (Id., Exhibit 2, pp. 5 - 7.) On February 2, 2004, Petitioner, by counsel R. Thomas Czarnik, filed a Motion to Set Aside Verdict/New Trial. (Document No. 53-3, Exhibit 14, pp. 88 - 89.) On February 23, 2004, the Circuit Court denied Petitioner's Motion to Set Aside Verdict/New Trial and sentenced Petitioner to 'the indeterminate terms of not less than ten (10) nor more than twenty (20) years" as to each Count to run consecutively.  (Document No. 24-1, Exhibit 3, pp. 8 - 11 and Document No. 53-3, Exhibit 14, pp. 1- 28.) The Circuit Court further ordered that the sentences as to Counts 15 and 16 be suspended. (Id.)

On September 2, 2004, Petitioner, by counsel, R. Thomas Czarnik, appealed his conviction and sentence to the West Virginia Supreme Court, raising the following assignments of error:

1. Whether the trial court erred in not ruling as a matter of law that Petitioner was not a "guardian" or in ruling the element of "guardian" was not proven beyond a reasonable doubt.

2. Whether the trial court erred in allowing "intrinsic" evidence of prior acts between Petitioner and J.M. which were lawful, in other states at prior times.

3. Whether the trial court erred in refusing to give Petitioner's instructions.

4. Whether the trial court erred in allowing evidence and witnesses that were not disclosed by the State in violation of scheduling order, discovery, and pretrial order.

(Document No. 24-1, Exhibit 4, pp. 12 - 35.) The West Virginia Supreme Court refused Petitioner's Petition for Appeal by order entered on December 2, 2004. State v. Rowe, Case No. 041603 (W.Va. Dec. 2, 2004). (Id., p. 13.)

On April 26, 2005, Petitioner by counsel, Gregory K. Ball, filed a Motion for New Trial. (Document No. 53-3, Exhibit 14, pp. 80 - 85.) As grounds for his motion, Petitioner asserted an alibi

defense and ineffective assistance of counsel. (Id.) On June 14, 2005, the Circuit Court denied

Petitioner's Motion. (Id., pp. 43 - 59.) The Court further noted that Petitioner's claim of ineffective

assistance of counsel was more appropriately considered in *habeas* proceedings and appointed Mr.

Ball as *habeas* counsel. (Id.)

On July 6, 2005, Petitioner, by counsel, Gregory K. Ball, filed a Petition for Writ of *Habeas*

*Corpus* in the Circuit Court of Mercer County. Rowe v. West Virginia Department of Corrections,

Civil Action No. 05-C-437 (Cir. Ct. Mercer Co. April 17, 2006); (Document No. 24-1, Exhibit 5,

pp. 44 - 51.) Petitioner raised the following grounds for *habeas* relief:

1.     The trial court erred in not ruling as a matter of law that petitioner was not
       a "guardian," or in ruling the element of "guardian" was not proven beyond
       a reasonable doubt.

2.     The trial court erred in allowing "intrinsic" evidence of prior acts between
       petitioner and J.M. which were lawful in other states at prior times.

3.     The trial court erred in refusing to give petitioner's jury instructions.

4.     Petitioner's counsel did not fully develop the factual basis that he was not a
       guardian at the time of trial.

5.     Petitioner's counsel did not pursue the defendant's evidence that he was in
       North Carolina during the time charged.

6.     Petitioner claims prejudicial statement by the trial judge and that the statute
       under which he was convicted was unconstitutionally vague.

(Id.) An omnibus hearing was conducted on January 13, 2006. (Id., Exhibit 6, p. 53.) The

Circuit Court heard testimony from LaDonna Rowe (victim's mother), Vickie Belcher

(Petitioner's mother), and Petitioner. (Id.) After addressing the merits of above claims, the

Circuit Court denied his Petition for Writ of *Habeas Corpus* by Order entered April 17,

2006. (Id., pp. 52 - 65.)

On October 18, 2006, Petitioner, by counsel, James B. Lees, filed a Petition for

Appeal from the Circuit Court's decision, raising the following grounds:

1.      Defendant alleges trial counsel was ineffective at trial in failing to:

   a.      Inquire as to who was awarded custody of J.M. in the November 2000 divorce.

   b.      Obtain and introduce into evidence the Court Order awarding custody to the mother.

   c.      Obtain any expert witness to opine to the validity of State's Exhibit 4, said document not bearing any signature or acknowledgment by Defendant. Nor does there appear to be any motions filed or briefs submitted to the court on the issue of the validity of a legal document prepared in another state, and not signed or agreed to by the Defendant which "purports" to name the Defendant as "guardian" of J.M.

   d.      Identify, interview, and possibly call as a witness the attorney who drafted State's Exhibit 4, and who wrote that the document which "purportedly" gave the Defendant (without his consent) "guardianship" of J.M.

   e.      Explain in any clear, concise manner the whereabouts of J.M. from November of 2000 through September of 2002.

   f.      Identify and call as witnesses the "friends" J.M. was living within Las Vegas during the summer of 2002 to support the Defendant's claim of emancipation.

   g.      Show by clear and affirmative evidence that the Defendant was residing in North Carolina during September of 2002 and not in Mercer County, West Virginia.

   h.      Elicit from Ms. Rowe the fact that the legal papers regarding guardianship prepared on or about November of 2000 were for use in North Carolina only and in fact, had been supplanted by later such papers sent to Nevada (to the "friends" of J.M.) in 2002.

   i.      Move for a mistrial upon the Prosecutor's blatant introduction of testimony that J.M. was "forced" to have sex with the Defendant at age fourteen (14).

4

    2.          Defendant alleges that West Virginia Code § 61-8D-5(a) is unconstitutional as-applied.

    3.          Defendant alleges that trial judge unfairly prejudiced the jury with statements from the bench.

(Id., Exhibit No. 7, pp. 69 - 87.). The West Virginia Supreme Court of Appeals refused Petitioner's appeal on January 24, 2007. (Id., p. 68.); Rowe v. West Virginia Department of Corrections, Case No. 062739 (W.Va. Jan. 24, 2007).

On May 7, 2007, Petitioner, an inmate at Mount Olive Correctional Complex [MOCC], and acting *pro se*, filed his Petition Under 28 U.S.C. § 2254 for Writ of *Habeas Corpus* By a Person in State Custody and an Application to Proceed *in Forma Pauperis*.[1] (Document Nos. 1 and 2.) Petitioner alleges the following grounds for *habeas* relief:

    A.      West Virginia Code § 61-8D-5(a) (1998) is unconstitutionally vague.

         i.        WV Code § 61-8D-5(1) is overbroad, as-applied, because J.M. had reached the age of consent.

    B.      Petitioner was denied the meaningful and effective assistance of counsel as guaranteed by the Sixth Amendment of the constitution of the United States of America.

         i.        Defense counsel failed to ascertain who was awarded full custody of JM when LaDonna Rowe divorced Petitioner in 2000.

         ii.      Defense counsel failed to secure a copy of the Court Order awarding custody to LaDonna Rowe and enter it into evidence at Petitioner's trial.

---

[1] Because Petitioner acted *pro se* initially in this matter, the documents which he has filed in this case will be held to a less stringent standard than if they were prepared by a lawyer and therefore, they will be construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

iii.          Defense counsel failed to secure an expert witness to opine to the validity of State's Exhibit 4, "Agreement of Guardianship" which does not bear any signature or acknowledgment of acceptance of Petitioner.

iv.          Defense counsel did not interview Ms. Holly M. McClanahan, Esquire, of Princeton, WV who allegedly drafted State Exhibit 4, a document that purportedly conferred guardianship on Petitioner, without his consent.

v.          Defense counsel did not present to jury a clear and concise of chronology of JM's activities after she attained the age of sixteen and left school.

vi.          Defense counsel did not identify JM's friends and employers in Nevada during 2001-2002 to substantiate Petitioner's contention that JM was emancipated under Nevada law.

vii.          Defense counsel did not present to the jury any material and relevant evidence that Petitioner was residing in Charlotte, Mecklenbury County, North Carolina, in September, 2002, and, therefore, not present in Mercer County, West Virginia during the period alleged in the indictment.

viii.          Defense counsel failed to elicit from Ms. Rowe the fact that she had revoked the Agreement for Guardianship prepared on November 3, 2000, and, replaced by a new agreement in 2002.

xi.          Defense counsel failed to move for a mistrial predicated on the prosecutor's blatant introduction of testimony that JM was "forced" to have sex with petitioner prior to her fourteenth birthday.

x.          Defense counsel failed to ensure that Petitioner was properly advised by the trial court of his right to testify under State v. Neuman, 371 S.E.2d 77 (W.Va. 1988).

xi.          Defense counsel failed to investigate Petitioner's alibi defense.

xii.          Defense counsel failed to request lesser-included offense instruction.

6

> C.     Petitioner was denied a fair and impartial jury trial as secured by the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States of America by the admission of evidence regarding legal conduct of Petitioner and the alleged victim in other jurisdictions.

(Document No. 1.) The undersigned entered a Proposed Findings and Recommendation on December 20, 2007, recommending that Petitioner's Application to Proceed *in Forma Pauperis* be denied because Petitioner made an inadequate showing of indigency. (Document No. 8.) On January 17, 2008, Petitioner paid the required $5.00 filing fee. (Document No. 9.) By Memorandum Opinion and Order entered on March 5, 2008, the District Court adopted the undersigned's Proposed Findings and Recommendation and referred the matter back to the undersigned for further proceedings. (Document No. 10.)

On September 11, 2008, Petitioner filed a "Motion to Refer Petition to Magistrate VanDervort."[2] (Document No. 13.) On October 15, 2008, Petitioner filed a "Motion for Partial Summary Judgment." (Document No. 15.) Specifically, Petitioner claimed he was entitled to partial summary judgment "on the basis that (a) WV Code § 61-8D-5(a) violates the Due Process Clause of the Fifth and Fourteenth Amendments to the Constitution of the USA, and (b) WV Code § 61-8D-5(a) violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the USA." (Id., p. 19.) In support of this Motion, Petitioner argued that he was improperly "adjudicated a factual guardian" of the victim. (Id., p. 17.) Petitioner contended that he was no longer the guardian of the victim at the time of their alleged consensual sexual relationship because the victim was emancipated and living in Las Vegas, Nevada. (Id., pp. 9 - 10, 12.) Finally, Petitioner claimed that "West Virginia Code § 61-8D-5(a) is unconstitutionally overbroad because the statute

---

[2] By Order entered on April 20, 2009, the undersigned denied as moot Petitioner's "Motion to Refer Petition to Magistrate VanDervort." (Document No. 17.)

criminalizes private, non-commercial, consensual sexual conduct by American citizens over sixteen years of age." (Id., p. 3.) Petitioner stated "[i]f an individual becomes an adult in sexual matters after his or her sixteenth birthday, the statutorily prescribed age of consent, then the prosecution of petitioner violates the constitutional right to privacy possessed by J.M. and petitioner." (Id., p. 11.) Thus, Petitioner alleged that he and the victim had "a liberty interest in the private, consensual sexual privacy." (Id., p. 3.)

By Proposed Findings and Recommendation entered on April 20, 2009, the undersigned recommended that the District Court deny Petitioner's Motion for Partial Summary Judgment as premature. (Document No. 18.) By Order also entered on April 20, 2009, the undersigned directed Respondent to show cause, if any, why Petitioner's Petition should not be granted. (Document No. 16.) By Memorandum Opinion and Order entered on June 8, 2009, United States District Judge David A. Faber adopted the undersigned's recommendation and denied Petitioner's Motion for Partial Summary Judgment. (Document No. 22.)

On June 29, 2009, Respondent filed his Response, Motion for Summary Judgment, and Memorandum in Support. (Document Nos. 23 - 26.) Respondent argues as follows: (1) West Virginia Code § 61-8D-5 is not unconstitutionally vague; (2) Trial counsel did not act ineffectively; and (3) The trial court did not improperly admit 404(b) evidence. (Document No. 26.) On June 30, 2009, Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Petitioner, advising him of his right to file a further response to Respondent's Motion to Dismiss. (Document No. 27.) On August 7, 2009, Attorney Thomas Gillooly filed a Notice of Appearance on behalf of Petitioner. (Document No. 31.) By Order entered on December 3, 2009, the Court stayed the case pending Petitioner's receipt of the corrected official transcript of Petitioner's

omnibus *habeas corpus* hearing. (Document No. 40.) On February 24, 2010, Petitioner filed a Motion for Termination of Stay. (Document No. 45.) By Order entered on March 2, 2010, the Court granted Petitioner's Motion for Termination of Stay and reinstated the case to the active docket. (Document No. 46.)

On May 6, 2010, Petitioner, by counsel, filed a Motion to Expand Record and his Response to Motion for Summary Judgment. (Document Nos. 49 and 50.) Petitioner argues that Respondent's Motion for Summary Judgment was premature and the record before the Court is incomplete. (Id.) Petitioner, therefore, requested that the Court enter an "order permitting him to defer a substantive response to the summary judgment motion pending the filing of a more complete record." (Document No. 49, p. 3.) By Order entered on May 19, 2010, the undersigned granted Petitioner's Motion to Expand the Record. (Document No. 51.) On June 7, 2010, Respondent filed its Reply stating that it was filing "all available pleadings named in this Court's Order of May 6, 2010." (Document No. 52.) On June 9, 2010, Petitioner, by counsel, filed its "Motion for Order Requiring State to Comply with Court's Instructions or Prove that It Cannot Do So" and Motion to Modify Scheduling Order. (Document Nos. 55 and 56.) On June 14, 2010, Respondent filed his Response and "Motion to Vacate Order to Expand Record and File Documents Regarding the Requested Parental Rights Termination Proceeding." (Document Nos. 59 and 60.) The Court held Status Conferences on June 30, 2010 and March 10, 2011. (Document Nos. 64 and 72.) By Order entered on March 16, 2011, the undersigned stayed the above case based upon the parties continued difficulty in obtaining pertinent records relating to the parental rights termination proceeding. (Document No. 75.) The Court further ordered that "upon the receipt of the pertinent records relating to the parental rights termination proceeding, Petitioner will have 60 days to file his Response to

Respondent's Motion for Summary Judgment." (Id.)

On July 16, 2012, Petitioner filed his Response to Respondent's Motion for Summary Judgement, Motion for Summary Judgment, and Memorandum in Support. (Document Nos. 79 - 81.) In his Response, Petitioner states that he "responds in opposition to the State's Motion for Summary Judgment (Document 24) as more particularly set forth in his memorandum in support of this response, and in support of his own motion for summary judgment, file simultaneously with this pleading." (Document No. 79.) In his Memorandum in Support, Petitioner argues as follows: (1) "By failing to apply the rule of lenity and strict construction in interpreting the guardian statute, the trial court denied Rowe due process of law;" (Document No. 81, pp. 20 - 24.); (2) "The trial court deprived Rowe of his constitutional rights by incrementally broadening its interpretation of the statute of conviction" (Id., pp. 24 - 27.); (3) "The trial court's failure to treat the term 'guardian' as a technical term, or a term of art, violated longstanding rules of statutory construction" (Id., pp. 27 - 28.); (4) "Rowe's Petition states a claim for the unconstitutionality of the guardian statute as-applied, a claim that has been properly presented and exhausted in the State court system" (Id., p. 29.); and (5) "The construction given the guardian statute in 2004 makes Rowe's conviction equivalent to conviction under the much broader statute not enacted until 2005, further demonstrating the denial of his right to due process" (Id., pp. 30 - 31.)

On September 10, 2012, Respondent filed his "Response/Reply Memorandum in Opposition to Petitioner's Motion for Summary Judgment and In Support of Respondent's Motion for Summary Judgment." (Document No. 87.) On October 1, 2012, Petitioner filed his "Reply to State's Response Opposing Petitioner's Motion for Summary Judgment." (Document No. 90.)

## FACTUAL BACKGROUND

Petitioner was convicted of engaging in a sexual relationship with J.M., the alleged victim. Petitioner and J.M.'s mother were married and had one child, G.R. Following the divorce, J.M. and G.R. resided with Petitioner. The children's mother agreed to the arrangement and allegedly designated Petitioner as J.M.'s guardian in a guardianship agreement. Petitioner was a long haul truck driver and often took the children on the road with him. At some point, J.M. and G.R. lived alone in Las Vegas. J.M. allegedly returned to Mercer County in September 2002, and resumed residing with Petitioner. After J.M. resumed residing with Petitioner, Petitioner allegedly applied for welfare benefits using the guardianship agreement to establish himself as J.M.'s guardian. In his *habeas* petition, Petitioner argues that he was not J.M.'s guardian.

Sharon Taylor testified that she was employed as a Family Support Specialist by the Department of Health and Human Resources. (Document No. 25-1, p. 51.) Ms. Taylor stated that her duties as a Family Support Specialist included taking applications for Temporary Assistance for Needy Families [TAFNF]. (Id., p. 52.) Ms. Taylor testified that she came in contact with Petitioner on February 4, 2003, in connection with a TAFNF application. (Id.) Ms. Taylor stated that Petitioner included two children on his application, G.R. and J.M. (Id., p. 53.) Ms. Taylor explained that Petitioner presented a birth certificate to establish his relationship with G.R. and a guardianship agreement to establish his relationship with J.M. (Id., pp. 53 - 54.) Ms. Taylor further stated that Petitioner provided her with "a copy of a letter from the lawyer that helped draw this up saying that he was given guardianship." (Id., p. 54.) Ms. Taylor testified that Petitioner "told me he was her stepfather and that he had been given guardianship of her." (Id.) Ms. Taylor, therefore, stated that Petitioner's TAFNF application was accepted and processed because he was the natural father of

G.R. and the guardian of J.M. (<u>Id.</u>, p. 55.) Ms. Taylor acknowledged that the guardianship agreement stated that "custody and guardianship of the guardian in Charlotte, North Carolina while the ward attends school in Charlotte, North Carolina." (<u>Id.</u>, p. 57.) Ms. Taylor further acknowledged that the guardianship agreement was only signed and notarized by J.M.'s mother – not Petitioner. (<u>Id.</u>)

Krystal Leedy testified that she was a Child Protective Service worker for the State of West Virginia. (<u>Id.</u>, p. 89.) Ms. Leedy stated that she had been a Child Protective Service worker for approximately three years and ten months. (<u>Id.</u>) Ms. Leedy testified that on February 25, 2003, the Department took custody of G.R. and J.M. (<u>Id.</u>, pp. 89 - 90.) Ms. Leedy explained that G.R. was 11 years old and J.M. was 17 years old when the Department took custody. (<u>Id.</u>, p. 90.) Ms. Leedy testified that LaDonna Rowe was the biological mother of G.R. and J.M. and Petitioner was the biological father of G.R. (<u>Id.</u>, p. 91.) Ms. Leedy testified that the Department subsequently sought to terminate the guardian rights and parental rights as to G.R. and J.M. (<u>Id.</u>, pp. 90 - 91.) Ms. Leedy explained that LaDonna Rowe voluntarily relinquished her rights as to G.R., but her rights as to J.M. were not addressed because J.M. "would have been turning 18 in a month." (<u>Id.</u>) Ms. Leedy testified that J.M. initially denied being abused by Petitioner. (<u>Id.</u>, p. 97.) Ms. Leedy stated that ten days after J.M. was removed from Petitioner's custody, J.M. disclosed the abuse by Petitioner. (<u>Id.</u>) Ms. Leedy testified that children "typically do not [disclose abuse] unless they feel that they are safe, and that they are in a safe environment." (<u>Id.</u>) Ms. Leedy further stated that she had no recollection of Petitioner being dismissed from the abuse and neglect case concerning J.M. "because he was not a biological parent and he had no rights." (<u>Id.</u>, p. 101.)

Robert Hinzman testified that in February 2003, he worked for the Bluefield City Police Department in the Detective Bureau. (Document No. 25-2, p. 13.) Officer Hinzman testified that he

went to Petitioner's apartment on February 20 or 21, 2002, and Petitioner stated that his two children were with him inside the apartment.[3] (Id., pp. 13 - 14.) According to Officer Hinzman, Petitioner stated that J.M. "was his step-daughter, and that he had guardianship over her and he had some document that would support what he was telling me." (Id., p. 14.) Officer Hinzman explained that "[i]nitially, he claimed her to be his daughter. Then I - - I repeated that in question form, and then he elaborated, step-daughter. And then he went on to elaborate on his own without being prompted by a question by myself." (Id., pp. 15 - 16.)

J.M. testified that she was 18 years old, her mother's name was LaDonna Litton, and her father's name was David Rowe. (Id., p. 16.) J.M. stated that Petitioner was her stepfather and she called him "dad" for years. (Id., pp. 17 - 18.) J.M. acknowledged that she had only been around her natural father a couple of times when she was "really little." (Id., p. 17.) J.M. stated that she did not remember how old she was when her mother and Petitioner were married, but she was in school. (Id.) J.M. testified that she was 14 years old and living in Bluefield, West Virginia, when her mother and Petitioner separated. (Id., pp. 18 and 20.) J.M. stated that Petitioner was a truck driver and they had a "comfortable life." (Id., p. 18.) J.M. explained that everything changed because her mother

---

[3]   Officer Hinzman testified that he was employed by the Bluefield City Police Department in February 2003. Officer Hinzman explained that during his employment with the police department he had occasion to visit Petitioner's apartment. When asked whether he remembered the date of the visit, Officer Hinzman stated as follows:

A.      I want to say February 21st, perhaps, 20th or 21st.

Q.      So February 21st, 2002, he told a police officer that he was [J.M.]'s guardian?

A.      Yes.

(Document No. 25-2, pp. 13 - 14.) Petitioner's counsel argues that the correct date was February 21, 2003, not February 21, 2002.

13

had a gambling problem that caused them to lose their home. (Id., pp. 18 - 19.) J.M. testified that

her mother and Petitioner "separated for a while" before the divorce. (Id., p. 19.) J.M. explained that

she was with Petitioner "all of the time" during the separation. (Id., p. 34.) J.M. stated that when she

was 14, she and G.R. went on a trip with Petitioner because "he was a truck driver" and "my parents

just got separated, so we went on the road with him." (Id., p. 20.) J.M. testified that the trip was

memorable because it was the first time she performed oral sex on Petitioner. (Id., p. 21 and 23.)

J.M. stated that subsequently she and Petitioner engaged in sexual intercourse. (Id., pp. 23 -24.) J.M.

stated she engaged in oral sex and sexual intercourse with Petitioner during the time Petitioner was

her stepfather and was in the process of divorcing J.M.'s mother. (Id., p. 24.) J.M. testified that she

knew her mother gave Petitioner guardianship "because he had papers." (Id.) J.M. explained that

Petitioner used the papers to prove guardianship when he enrolled J.M. in school and took her to the

doctor. (Id.) J.M. stated that they returned to Mercer County, West Virginia, in September, 2002.

(Id., p. 25.) J.M. stated that G.R. did not always reside with her and Petitioner. (Id., pp. 26 - 27.)

J.M. explained that when they returned to Mercer County in September, 2002, G.R. began living

with her and Petitioner in December, 2002. (Id., p. 28.) J.M. stated that she and G.R. were removed

from Petitioner's home in February, 2003. (Id.) At the time of her removal, J.M. explained that she

and Petitioner had a relationship where they were sharing a bed and having sexual intercourse or oral

sex on a daily basis. (Id., p. 28.) J.M. stated that she engaged in oral sex with Petitioner "when I was

on my period." (Id., p. 29.) J.M. testified that she never had a job during the time she was with

Petitioner. (Id., p. 27.) J.M. stated that she and Petitioner went to the Department of Health and

Human Resources for the purpose of getting "help, food stamps, stuff like that." (Id., pp. 29 - 30.)

J.M. testified that Petitioner represented to the Department of Health and Human Resources that he

14

was J.M.'s stepfather and exhibited the guardianship paper. (Id., p. 30.) J.M. testified that she and Petitioner had a step-father and step-daughter relationship when they were around regular people, but when they were in private they had a "boyfriend/girlfriend" relationship. (Id., pp. 31 - 32.)

On cross examination, J.M. stated that she lived in Nevada between the time of living in North Carolina and West Virginia. (Id., p. 34.) J.M. testified that after being in Nevada for a short period of time, she took G.R. and "went to stay with my friend and her parents." (Id., p. 35.) J.M. stated that after she moved in with her friend, she contacted Petitioner to send her money and the title to her car. (Id., pp. 35 - 36.) J.M. testified that Petitioner gave her the title to the car and money to get the car out of impound. (Id., p. 38.) J.M. stated that Petitioner introduced himself as a friend to J.M.'s friends. (Id.) J.M. explained that even though she did not have a driver's license, she had a car that she drove. (Id., p. 36.) J.M. acknowledged she contacted her mother by phone while she was "out living with friends" in Nevada and her mother said "she didn't want [J.M.] to come back to her." (Id., p. 39.) J.M. stated G.R. went back to live with their mother. (Id., pp. 39 - 40.) J.M. further stated that while in Nevada she "relocated from place to place" and she considered herself to be "pretty much" own her own for about two or three months. (Id., pp. 37 and 41.) J.M. acknowledged she did not work or earn money, she "just lived on the gracious friends and what money Mr. Rowe would send [her] from time to time." (Id.) J.M. stated that sometime in 2002, Petitioner came to Las Vegas to pick her up after J.M. requested that Petitioner do so. (Id., pp. 37 - 38.) J.M. stated that she and Petitioner returned to West Virginia after Petitioner picked her up in Las Vegas. (Id., p. 38.) J.M. acknowledged during the time she was in Las Vegas, Petitioner stated he wanted to marry J.M. (Id.)

On redirect, J.M. explained she "never really introduced [Petitioner] as my friend. He was

my step dad, and everybody I was with knew that, and they knew everything that happened, and they knew everything that was going on." (Id., p. 42.) J.M. explained that she went back to Petitioner "[b]ecause my mom refused to take me. I didn't have nothing else to do. I had nowhere else to go." (Id.) J.M. further stated that Petitioner "promised me that it wouldn't be like it was any more." (Id.) J.M. stated that once she moved back to West Virginia with Petitioner, she was having sex with Petitioner on a daily basis up until the time she was removed from his home. (Id., pp. 42 - 43.) J.M. acknowledged that she was a willing participant, but she was not affectionate with him. (Id.) J.M. further stated that she had no source of income other than the money that Petitioner would give her. (Id., p. 46.) J.M. testified that she was able to save about $80 so she could leave, but Petitioner found the money and "took it." (Id.)

LaDonna Rowe testified she was the mother of J.M. and G.R. (Id., p. 62.) Mrs. Rowe stated she was formerly married to Petitioner, but the final divorce order was entered in November 2000. (Id.) Mrs. Rowe acknowledged that "[b]oth children wanted to go live with [Petitioner] when we divorced." (Id.) Mrs. Rowe testified that she had a guardianship document prepared "[b]ecause when the children wanted to go live with David he needed some kind of document in order for him to register [J.M.] for school, and if [J.M.] needed medical attention, there would not be a custodial parent with [J.M.]." (Id.) Mrs. Rowe explained that she only intended the guardianship document to be used in North Carolina because "that was the only place they were supposed to live when they left." (Id., pp. 62 - 63.) Mrs. Rowe explained that she did not know that J.M. was living with friends in Las Vegas until she received a phone call from J.M. (Id., p. 63.) Mrs. Rowe testified that when she learned that J.M. and G.R. were living with friends in Las Vegas, she "faxed them, basically, a note with my signature on it saying the children had permission to stay with them until I can make

16

arrangement to fly them back here." (<u>Id.</u>)

On cross examination, Mrs. Rowe acknowledged that even though she only intended the guardianship document to be used in North Carolina, she did not intend for Petitioner to come back to West Virginia to get another agreement if he moved to another city. (<u>Id.</u>, p. 64.) Mrs. Rowe stated that she did expect Petitioner "to let me know if they were moving to a different state." (<u>Id.</u>) Mrs. Rowe testified that she did not know that J.M. and G.R. "were in Ohio till after they were there. Then I didn't know they were in Las Vegas until I got the phone call from [J.M.]." (<u>Id.</u>, p. 65.)  Mrs. Rowe acknowledged that J.M. told her what Petitioner "had done to her." (<u>Id.</u>, p. 65.) Mrs. Rowe further stated that Petitioner acknowledged what "he had done to [J.M.]," but Petitioner stated that it was consensual. (<u>Id.</u>) Mrs. Rowe testified that after receiving the phone call from J.M., "that's when I made arrangements for Social Services to pick up the children in Nevada and fly them back here, but [J.M.] ran away from Child Haven before they could fly them back here." (<u>Id.</u>, pp. 65 - 66.) Mrs. Rowe acknowledged that she allowed G.R. to live with Petitioner in December, 2002, which was after Petitioner returned to West Virginia with J.M. (<u>Id.</u>, p. 66.) Mrs. Rowe, however, explained that she "did not know [J.M.] was with [Petitioner] when they came back here until right before Social Services picked them up." (<u>Id.</u>)

## THE APPLICABLE STANDARDS

Federal *habeas* relief is available to a State prisoner under 28 U.S.C. § 2254, only if the prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a)(2002); <u>See</u> <u>also</u> <u>Sargent v. Waters</u>, 71 F.3d 158, 160 (4th Cir. 1995). Section 2254(d) provides that when the issues raised in a Section 2254 Petition were raised and considered on the merits in State Court *habeas* proceedings, federal *habeas* relief is unavailable unless the State

Court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court stated that under the "contrary to" clause in § 2254(d)(1), a federal *habeas* Court may grant *habeas* relief "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13, 120 S.Ct. at1523. A federal *habeas* Court may grant relief under the "unreasonable application" clause of § 2254(d)(1) where the State Court identified the appropriate Supreme Court precedent but unreasonably applied the governing principles. Id. When a petitioner challenges the factual determination made by the State Court, "federal habeas relief is available only if the state court's decision to deny post-conviction relief was 'based on an unreasonable determination of the fact.'" 28 U.S.C. § 2254(d)(2). In reviewing a State Court's ruling on post-conviction relief, "we are mindful that 'a determination on a factual issue made by the State court shall be presumed correct,' and the burden is on the petitioner to rebut this presumption 'by clear and convincing evidence.'" Tucker v. Ozmint, 350 F.3d 433, 439 (4th Cir. 2003); also see 28 U.S.C. § 2254(e).[4] On this framework, consideration should be given to

---

[4] Title 28, U.S.C. Section 2254(e) provides:

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and

Respondent's Motion for Summary Judgment.

**Motion for Summary Judgment:**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party

---

convincing evidence.

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

    (A) the claim relies on –

        (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

        (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

    (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

on the evidence presented. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Petitioner's claims, summary judgment is appropriate.

<u>ANALYSIS</u>

**1.**      **<u>Statute Not Unconstitutionally Vague</u>:**

    In his Petition, Petitioner argues that West Virginia Code § 61-8D-5, the statute under which he was convicted, is unconstitutionally vague. (Document No. 1, pp. 4 - 9.) First, Petitioner argues that there was no legal proceeding prior to September 2002, that declared him to be the guardian of J.M. (<u>Id.</u>, p. 4.) Petitioner argues "that the statute must limit itself to a legal declaration of guardianship in order to avoid a violation of the due process clauses of the Constitution of the U.S.A., Fifth Amendment, Fourteenth Amendment, Section 1." (<u>Id.</u>) Citing West Virginia Code § § 16-5L-3, 16-30-3, and 44-10-3, Petitioner argues the "only consistent definition of guardian is one which requires a Court Order designating an individual as the minor's guardian." (<u>Id.</u>, pp. 4 - 5.) Second, Petitioner argues that "there was no relevant evidence governing the period covered by the indictment that petitioner had negotiated a contract to serve as J.M.'s guardian while she was in West Virginia." (<u>Id.</u>, p. 5.) Petitioner explains that West Virginia Code § 61-8D-1(5) is unconstitutionally vague as-applied because J.M. was emancipated while she was in Las Vegas, prior to her return to West Virginia. (<u>Id.</u>) Petitioner further states that his "status as J.M.'s stepfather terminated when he divorced LaDonna Rowe" and he is not a "relative of J.M." (<u>Id.</u>) Petitioner asserts that even though he enrolled J.M. in school and sought medical care for her while residing in North Carolina, this relationship ended prior to her return to West Virginia. (<u>Id.</u>) Petitioner, therefore, states that "there is no evidence that Petitioner fulfilled a guardianship role in 2002." (<u>Id.</u>)

20

Third, Petitioner argues that West Virginia Code § 48-2-310 (Age of consent for marriage) provides that a legal guardian can consent to a child being married at the age of 16. (Id., pp. 5 - 6.) Thus, Petitioner argues that "Petitioner, as J.M.'s lawful guardian, could provide the necessary written consent to enable Rudolph Jennings, County Clerk, to issue a marriage license to J.M. so she could marry Petitioner, thereby precluding the criminal proceeding that resulted in Petitioner being incarcerated for 20 to 40 years." (Id.) Citing Lawrence v. Texas, 539 U.S. 558 (2003), Petitioner further argues that "consensual, heterosexual penile-vaginal sexual intercourse in the privacy of one's home is constitutionally protected." (Id., p. 8.). Petitioner, therefore, contends that because J.M. had reached the age of consent, Petitioner and J.M. could lawfully engage in sexual activity within the privacy of their home. (Id., pp. 8 - 9.) Fourth, Petitioner claims that West Virginia Code § 61-8D-5 is overbroad because it construes consensual sexual activity to be physical abuse. (Id., p. 6.) Petitioner argues that "[c]onsensual sexual intercourse of the individual between the ages of 16 and 18 does not categorically constitute physical 'abuse.'" (Id., pp. 7 - 8.)

In his Motion for Summary Judgment, Respondent argues that he is entitled to summary judgment because West Virginia Code § 61-8D-5 is not unconstitutionally vague. (Document No. 26, pp. 11 - 17.) Respondent notes that "Petitioner's argument in support of this claim is more suited to a claim of insufficient evidence than a challenge to the statute as unconstitutionally vague." (Id., p. 13.) Respondent states that West Virginia Code § 61-8D-1(5) defines the term "guardian" and "[n]o other statutory definition of the word "guardian" applies. (Id., p. 14.) Respondent argues that a "simple reading of the statute and the definition is sufficient to defeat this claim in all regards." (Id.) Respondent states that a "guardian can be established by 'any contract agreement or legal proceeding.'" (Id.) Respondent argues that "[w]hether or not Petitioner qualified as a guardian under

West Virginia Code § 61-8D-5(a) was a fact determination for the jury made pursuant to the language of this statute and no other." (Id.) Respondent claims that the "testimony at trial was that Petitioner was designated as J.M.'s guardian by an agreement prepared by an attorney and used by Petitioner to make parental decisions on behalf of J.M. and G.R." (Id.) Respondent notes that Petitioner inappropriately cites irrelevant statutes setting forth the "guardianship requirements for conservatorship of a protected person, fiduciary duties for a minor child, or for a court ordered guardian ad litem." (Id., p. 15.) Respondent, therefore, concludes that Petitioner's argument fails to rebut the presumption that the Circuit Court's findings are a correct application of federal law. (Id.)

Next, Respondent contends that the term "abuse" as used in West Virginia Code § 61-8D-5(a) is not unconstitutionally vague. (Id., pp. 15 - 16.) Respondent asserts that it is not necessary to define the term "abuse" because a "clear reading of the statute is sufficient to 'provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." (Id., p. 16.) Respondent claims that a reading of the statute reveals that the term "abuse" does not require a showing of physical harm. (Id., p. 15.) Thus, Respondent argues that it is immaterial whether the sexual activity was consensual or whether physical harm resulted. (Id.) Respondent, therefore, contends that Petitioner's claim "is contradicted by the statute itself and does not support an argument that the state court misapplied federal law." (Id., p. 16.)

Third, Respondent argues that Petitioner's claim that J.M. had the legal capacity to consent because she was over sixteen is without merit. (Id.) Specifically, Respondent claims that West Virginia Code § 48-2-301 is an unrelated domestic statute that creates an age of consent for marriage. (Id.) Thus, Respondent asserts that West Virginia Code § 48-2-301 "has no application under the criminal statutes." (Id.) Respondent notes that West Virginia Code § 61-8D-1 defines

"child" for purposes of Section 61-8D-5. (<u>Id.</u>, p. 17.) Section 61-8D-1 defines "child" as "any person under eighteen years of age not otherwise emancipated by law." (<u>Id.</u>) Respondent further notes that Petitioner's reliance upon <u>Lawrence v. Texas</u>, 539 U.S. 558 (2003) is misplaced. (<u>Id.</u>, pp. 16 - 17.) Respondent notes that <u>Lawrence</u> recognized that "consensual, heterosexual sexual intercourse in the privacy of one's home is constitutionally protected." (<u>Id.</u>, p. 16.) Respondent, however, argues that "<u>Lawrence</u> did not grant children the capacity to have sex with adults nor did it provide for a federal age of consent below the age of majority." (<u>Id.</u>, p. 17.) Finally, Respondent contends that "[a]ny argument Petitioner makes challenging whether the victim was emancipated or not is a challenge to the sufficiency of the evidence and does not support an argument that West Virginia Code §§ 61-8D-1 and 5 are unconstitutionally vague." (<u>Id.</u>)

In his Response and Motion for Summary Judgment, Petitioner contends that the Circuit Court "construed the statutory definition of 'guardian' so broadly that it made the statute, as-applied to Rowe, unconstitutionally vague." (Document No. 81, p. 20.) First, Petitioner contends that the trial court denied Petitioner due process of law "by failing to apply the rules of lenity and strict construction in interpreting the guardian statute." (<u>Id.</u>, pp. 20 - 24.) Petitioner states that "[p]enal statutes must be strictly construed against the State and in favor of the defendant." (<u>Id.</u>, p. 23.) Second, Petitioner argues that the "trial court deprived Rowe of his constitutional rights by incrementally broadening its interpretation of the statute of conviction. (<u>Id.</u>, pp. 24 - 27.) Petitioner notes that initially the Circuit Court indicated that "documentation of some kind" was required to establish guardianship. (<u>Id.</u>, p. 24.) Petitioner complains that as the trial progressed, the "trial court was construing the guardianship statute to cover 'anybody who can be in any sort of fiduciary position with [the child]." (<u>Id.</u>, p. 25.) Petitioner states that the Circuit Court's "refusal of almost all

of Rowe's proffered instructions . . . had the effect of enforcing the court's collapsing of all the statutory categories (parent, guardian, custodian) into a single category: what it called a 'fiduciary.'" (Id.) Petitioner argues that the Circuit Court failed to conduct a constitutional analysis when considering and denying his State *habeas* Petition regarding the above issue. (Id., p. 26.) Petitioner contends that "[i]n its ruling on Rowe's state *habeas* petition, the circuit court construed the adjective 'any' (in the phrase 'any contract, agreement or legal proceeding') to legitimize casting the broadest, most ill-defined net for the capture of defendants." (Id.) Petitioner asserts that "the nouns, including 'guardian,' were given only secondary significance." (Id.) Thus, Petitioner argues that "the circuit court interpreted the Legislature to have sanctioned casting the broadest, least exact net possible." (Id.) Petitioner further complains that in denying his State *habeas* Petition, the Circuit Court referenced "evidence of events that occurred outside the time period of the charged conduct as probative of the 'guardian' element of the alleged crime." (Id., p. 27.)

Third, Petitioner claims that the Circuit Court failed "to treat the term 'guardian' as a technical term, or a term of art, violated longstanding rules of statutory construction." (Id., pp. 27 - 29.) Petitioner argues that "[t]echnical terms, or terms of art, must be given their technical meanings." (Id., p. 27.) Petitioner asserts that "all of the relevant definitional terms have longstanding technical legal meaning: 'guardian,' 'contract,' 'agreement,' and 'legal proceeding.'" (Id., p. 28.) Petitioner states that the "circuit court abdicated its responsibility to construe any of those terms correctly." (Id.) Petitioner complains that the Circuit Court "treated the term 'any' as permitting the terms 'contract,' 'agreement,' and 'legal proceeding' to be treated as if they were not technical terms, which would give them a scope narrower than terms used in ordinary speech." (Id., p. 31.) Petitioner also complains that "[s]ince Rowe never signed the guardianship 'agreement' on

the line set aside for that purpose, the circuit court in effect applied the doctrine of estoppel, making Rowe a party to the agreement by his alleged conduct alone." (Id., p. 28.) Finally, Petitioner asserts that the Circuit Court's order denying his State *habeas* Petition "runs counter to the evidentiary-hearing testimony of the alleged victim's mother, who signed the custody 'agreement.'" (Id.) Petitioner explains that the victim's mother testified at the omnibus hearing and trial "that she intended [the agreement] to apply only to her daughter's presence with Rowe in the State of North Carolina, as the Agreement's text also provides." (Id.)

Fourth, Petitioner claims that "the State attempts to recast Rowe's constitutional challenge to the guardian statute as-applied by describing it as 'more suited to a claim of insufficient evidence than a challenge to the statute as unconstitutionally vague.'" (Id., p. 29.) Citing West v. Wright, 931 F.2d 262, 266 (4th Cir. 1991), Petitioner argues that "there is no legal distinction between a sufficiency-of-the-evidence claim and a constitutional claim." (Id.) Petitioner contends that an unconstitutional-as-applied argument is properly preserved and exhausted. (Id.) Finally, Petitioner argues that "the construction given the guardian statute in 2004 makes Rowe's conviction equivalent to a conviction under the much broader statute not enacted until 2005, further demonstrating the denial of his right to due process." (Id., p. 30.)

In his Response/Reply, Respondent first argues that "neither the State in this case nor the courts have considered Rowe's claims relying upon any language from the 2005 [statutory] version." (Id., p. 2.) Second, Respondent asserts that the jury was instructed based only upon the statutory definition of guardian. (Id.) Respondent notes that the "evidence at trial clearly established that Petitioner 'had care and custody' of J.M. 'as the result of [an] . . . agreement,' thus meeting the statutory definition." (Id.) Third, Respondent argues that even though Petitioner did not sign the

"Agreement of Guardianship," Petitioner's conduct evidenced his consent and belief that he was J.M.'s guardian. (Id., p. 4.) Fourth, Respondent asserts that the Legislature did not choose to limit the application of West Virginia Code §§ 61-8D-1 and 5 to only a person who is a guardian by court order. (Id., p. 5.) Fifth, Respondent claims "[t]here is nothing 'vague' about having 'care and custody of a child as the result of any contract, agreement or legal proceedings.'" (Id., p. 6.) Respondent explains that "Petitioner would surely know that his conduct met that definition, because he, on multiple occasions, proclaimed his 'care and custody [of J.M.] as the result of . . . [an] agreement.'" (Id.) Thus, Respondent contends that the statute was not vague as-applied to Petitioner. (Id., pp. 6 - 7.) Finally, Respondent argues that in denying Petitioner's State *habeas* Petition, the State *habeas* Court properly discussed the "question of whether a reasonable person would have been on notice that Petitioner's conduct violated that statute, which is the proper test to apply under a constitutional vagueness analysis." (Id., pp. 7 - 8.)

In denying the above claim, the State *habeas* court found as follows:

> In W. Va. Code § 61-8D-1, the statute sets forth definitions of important terms as used within Article 8D. Among them, the legislature placed *guardian* and its definition. Specifically, as defined by W. Va. Code § 61-8D-1(5), guardian "means a person who has care and custody of a child as the result of *any* contract, agreement or legal proceeding." (Emphasis added). Here, the Petitioner's argument that he was adjudicated a "factual guardian" is misplaced. No such determination of factual or legal guardianship is necessary under the statute.
>
> Assuming *arguendo* that there is, "any" contract, agreement, or legal proceeding, such is sufficient for conviction under the statute. Following their divorce, the Mother had the guardianship agreement drawn up by a competent attorney. Further, it was her testimony at the evidentiary hearing that her purpose for the document was to provide the Petitioner with guardianship over her daughter. The Petitioner then utilized the document to enroll the victim into school, get her medical attention, and even apply for welfare benefits. These acts belie the Petitioner's contention that he was not the victim's guardian. As such, this ground is wholly without merit and this Court will sustain the constitutionality of the statute in question as non-violative of the principles of due process.

(Document No. 24-1, Exhibit 6, p. 57.)

A criminal statute complies with due process if the statute "provide[s] adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal."[5] United States v. Hsu, 364 F.3d 192, 196 (4th Cir. 2004). Thus, a criminal statute must "define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." Skillings v. United States, ___ U.S. ___, 130 S.Ct. 2896, 2927, 177 L.Ed.2d 619(2010), quoting Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); also see United States v. Williams, 553 U.S. 285, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008)("A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what the fact is. Thus, we have struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent' – wholly subjective judgments without statutory definitions, narrowing context, or settled legal meaning." United States v. Williams, 553 U.S. 285, 128 S.Ct. at 1846; also see United States v. National Dairy Products Corp., 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963)(A "strong presumptive

---

[5] Individuals alleging a criminal statute to be unconstitutionally vague must assert an "as-applied" challenge. United States v. Sun, 278 F.3d 302, 209 (4th Cir. 2002)(Claims of statutory vagueness that do not implicate the First Amendment must be examined in the light of the facts of the case at hand.) Therefore, facial vagueness challenges to criminal statutes are allowed only when the statute implicates First Amendment rights. United States v. Klecker, 348 F.3d 69, 71 (4th Cir. 2003), cert. denied, 541 U.S. 981, 124 S.Ct. 1896, 158 L.Ed.2d 482 (2004).

validity" attaches to Acts of Congress and "statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall with their language.") "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 fn. 7, 102 S.Ct. 1186, 1191 fn.7, 71 L.Ed2d 362 (1982), quoting Parker v. Levy, 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

The undersigned finds that Petitioner's above claim is without merit because there is no evidence that the State *habeas* court's determination was contrary to a reasonable application of federal law, or based on an unreasonable determination of facts. West Virginia Code § 61-8D-5(a) (2002) provides as follows:

> In additional to any other offenses set forth in this code, the Legislature hereby declares a separate and distinct offense under this subsection, as follows: If any parent, guardian or custodian of a child under his or her care, custody or control, shall engage in or attempt to engage in sexual exploitation of, or in sexual intercourse, sexual intrusion or sexual contact with, a child under his or her care, custody or control, notwithstanding the fact that the child may have willingly participated in such conduct, or the fact that the child may have consented to such conduct or the fact that the child may have suffered no apparent physical injury or mental or emotional injury as a result of such conduct, then such parent, guardian or custodian shall be guilty of a felony and, upon conviction thereof, shall be imprisoned in the penitentiary not less than ten nor more than twenty years, or fined not less than five hundred nor more than five thousand dollars and imprisoned in the penitentiary not less than ten years nor more than twenty years.

A review of the record reveals that the above statute was not unconstitutionally vague as-applied to Petitioner. First, Petitioner contends that statute is vague as to the definition of a "guardian." Petitioner contends that (1) he had no way of knowing that he would be considered as a J.M.'s guardian, and (2) the trial court failed  to treat the term 'guardian' as a technical term, or a term of art. As stated above, a criminal statute complies with due process if the statute provides adequate

notice to a person of ordinary intelligence that his contemplated conduct is illegal. West Virginia Code § 61-8D-1(5) (2002) defines "guardian" as "a person who has care and custody of a child as the result of any contract, agreement or legal proceeding." The undersigned finds that the foregoing definition of "guardian" is not vague. Additionally, the record reveals that the trial court defined "guardian" by use of the above statutory definition. Petitioner claims, however, that he did not contemplate that he would be considered J.M.'s guardian because he did not sign the guardianship agreement and the guardianship agreement did not render him the legal guardian of J.M. Despite the fact that Petitioner did not sign the guardianship agreement and he was not declared J.M.'s guardian in a legal proceeding, the record reveals that Petitioner knew, or should have known, he was J.M.'s guardian pursuant to  West §Virginia Code § 61-8D-1 and 5.

During the criminal trial, Ms. Taylor testified that in February, 2003, Petitioner "told me he was her stepfather and that he had been given guardianship of her." (Document No. 25-1, pp. 53 - 54.) Additionally, Ms. Taylor stated that Petitioner presented a copy of the guardianship agreement and "a letter from the lawyer that helped draw this up saying he was given guardianship." (Id.) According to Officer Hinzman, Petitioner stated in February 2003, that J.M. "was his step-daughter, and that he had guardianship over her and he had some document that would support what he was telling me." (Document No. 25-2, p. 14.) J.M. testified that following the separation of her mother and Petitioner, J.M. knew her mother gave Petitioner guardianship "because he had papers." (Id., p. 24.) J.M. explained that Petitioner used the papers to prove guardianship when he enrolled J.M. in school and took her to the doctor. (Id.) J.M. stated that once she moved back to West Virginia with Petitioner in September 2002, she was having sex with Petitioner on a daily basis up until the time she was removed his home. (Id., pp. 28, 42 - 43.) LaDonna Rowe testified that the final divorce

order was entered in November 2000, and she had a guardianship document prepared "[b]ecause when the children wanted to go live with [Petitioner] he needed some kind of document in order for him to register [J.M.] for school, and if [J.M.] needed medical attention, there would not be a custodial parent with [J.M.]." (Id., p. 62.) Although Mrs. Rowe explained that she only intended the guardianship document to be used in North Carolina because "that was the only place they were supposed to live when they left," Mrs. Rowe stated that she did not intend for Petitioner to come back to West Virginia to get another agreement if he moved to another city. (Id., pp. 62 - 64.) Despite the fact that Petitioner did not sign the guardianship agreement and he was not declared J.M.'s guardian in a legal proceeding, West Virginia Code §§ 61-8D-1 defines a "guardian" is a "person who has care and custody of a child as the result of any contract, agreement or legal proceeding." The statutory definition of "guardian" clearly encompassed the agreement established between J.M.'s mother and Petitioner. Petitioner should have known that he was the "guardian" of J.M. pursuant to West Virginia Code §§ 61-8D-1 and 5 because Petitioner had care and custody of [J.M.] as the result of an agreement. The record reveals that Petitioner represented himself to be J.M.'s guardian by presenting the guardianship agreement beginning at the time of the divorce until the time J.M. was removed from his custody in February, 2003. The undersigned, therefore, finds that West Virginia Code §§ 61-8D-1 and 5 defined the criminal offense with sufficient definiteness that Petitioner could understand what conduct was prohibited and in a manner that did not encourage arbitrary and discriminatory enforcement. Accordingly, Petitioner is not entitled to *habeas* relief on the above issue.

Second, Petitioner contends that the trial court improperly broadened its interpretation of the statute of conviction. In support, Petitioner makes reference to discussions occurring between the

30

trial court and counsel. Petitioner alleges that the trial court "constru[ed] the Guardian Statute to cover 'anybody who can be in any sort of fiduciary position with [the child].'" Although the trial court may have engaged in discussions with counsel concerning the definition of a guardian, such comments were not made in front of the jury. At the conclusion of the evidence, the trial court instructed the jury as follows:

> Sexual Abuse by A Guardian is committed when any guardian of a child under his care, custody or control engages in sexual intercourse with a child under his care, custody or control, notwithstanding the fact that the child may have willingly participated in such conduct, or the fact that the child may have consented to such conduct or the fact that the child may have suffered no apparent physical injury or mental or emotional injury as a result of such conduct.

> "Child" means any person under eighteen years of age not otherwise emancipated by law.

> "Guardian" means a person who has care and custody of a child as the result of any contract, agreement or legal proceeding.

> \* \* \*

(Document No. 53-2, p. 7.) Thus, the jury instruction used by the trial court was verbatim to definition of "guardian" as set forth in West Virginia Code § 61-8D-1. Furthermore, the trial court instructed the jury that it could "not consider [Petitioner's] former relationship as her step-father as any proof that he was her guardian." (Document No. 53-2, p. 11.) The undersigned, therefore, finds no indication that the trial court improperly broadened the definition of the statute of conviction.

Third, Petitioner argues that West Virginia Code § 61-8D-5 is overbroad as-applied to him because there was no evidence of physical harm as a result of the "abuse." The statute provides that a guardian is guilty of abuse if he engages in or attempts to engage in sexual intercourse with a child under his care, custody or control, "notwithstanding . . . the fact that the child may have suffered no apparent physical injury or mental or emotional injury as a result of such conduct." The statutory

language clearly provides that the lack of physical injury is irrelevant. Although J.M. may have suffered no physical harm as a result of engaging in sexual intercourse with Petitioner, Petitioner should have known that his conduct was prohibited by West Virginia Code § 61-8D-5. Petitioner, therefore, is not entitled to *habeas* relief on the above issue.

Fourth, Petitioner argues that West Virginia Code § 61-8D-5 is overbroad as-applied to him because J.M. was the "age of consent." Petitioner appears to argue that West Virginia Code § 61-8D-5 is contradicted by West Virginia Code § 43-8-301 and Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). West Virginia Code § 43-8-301 creates an age of consent for marriage. In Lawrence, the Supreme Court held that the "Texas statute making it a crime for two persons of the same sex to engage in certain intimate sexual conduct violates the Due Process Clause." Lawrence, 539 U.S. at 558, 123 S.Ct. at 2473. The undersigned finds that Petitioner's above claim is without merit. West Virginia Code § 43-8-301 is inapplicable to West Virginia Code § 61-8D-5, which is a criminal statute. Additionally, West Virginia Code § 61-8D-5 provides that a guardian is guilty of abuse if he engages in or attempts to engage in sexual intercourse with a child under his care, custody or control, "notwithstanding the fact that the child may have willingly participated in such conduct." The statutory language clearly provides that the child's consent and willingness to participate is irrelevant. Although J.M. may have consented to engage in sexual intercourse with Petitioner, Petitioner should have known that his conduct was prohibited by West Virginia Code § 61-8D-5. Moreover, West Virginia Code § 61-8D-1 (2002) defines "child" as "any person under eighteen years of age not otherwise emancipated by law." The record clearly reveals that J.M. was under the age of eighteen at the time of the abuse and there was no evidence that J.M. was emancipated by a court proceeding. To the extent Petitioner asserts that J.M.'s actions in Las

32

Vegas resulted in her being emancipated goes to the sufficiency of the evidence. Finally, Petitioner's reliance on <u>Lawrence</u> is misplaced as the Supreme Court did not hold that children could consent to engaging in sexual activity with an adult or guardian. Therefore, Petitioner is not entitled to *habeas* relief on the above issue.

## 2.  <u>Ineffective Assistance of Counsel</u>:

The standards established by the United States Supreme Court in determining whether or not a defendant was denied his Sixth Amendment right to effective assistance of counsel are set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ineffective assistance of counsel claims consist of mixed questions of fact and law. <u>Id.</u> Under the two-pronged standard, a Petitioner must show (1) that counsel's performance was so deficient that it fell below an objective standard of reasonableness, and (2) that counsel's deficiency resulted in prejudice so as to render the results of the trial unreliable. <u>Id.</u> at 687-91, 104 S.Ct. at 2064-66. Counsel's performance is entitled to a presumption of reasonableness and judicial review of counsel's strategic decisions is highly deferential. <u>Id.</u> at 689, 104 S.Ct. at 2065. Thus, a petitioner challenging his conviction on the grounds of ineffective assistance must overcome a strong presumption that the challenged actions constituted sound trial strategies. <u>Id.</u> The Court in <u>Strickland</u> cautioned against the ease in second-guessing counsel's unsuccessful assistance after the adverse conviction and sentence are entered. <u>Id.</u> The Fourth Circuit Court of Appeals specifically recognized that ineffective assistance of counsel may not be established by a "Monday morning quarterbacking" review of counsel's choice of trial strategy. <u>Stamper v. Muncie</u>, 944 F.2d 170, 178 (4th Cir. 1991), <u>cert. denied</u>, 506 U.S. 1087 (1993). Applying this standard, and based upon all of the evidence of record, the Court will address the merits of each of Petitioner's allegations of ineffective assistance of

counsel as set forth above.

### A. *Guardianship Issue.*

In his Petition, Petitioner argues that trial counsel was ineffective in failing to thoroughly investigate the "guardianship issue." (Document No. 1, pp. 9 - 12.) First, Petitioner contends that trial counsel should have investigated the mother's intent as to the guardianship agreement and the fact that she had "legal custody" of J.M. following the divorce. (Id., pp. 9 and 12.) Petitioner states that the guardianship agreement was "for the express purpose of permitting J.M. to attend schools in Charlotte, N.C." (Id., p. 11.) Petitioner further argues that the guardianship agreement was invalid because there was no "offer, acceptance, consideration, and a meeting of minds." (Id.) Petitioner contends that trial counsel should have obtained and expert witness to state an opinion as to whether the guardianship agreement was signed by Petitioner. (Id., p. 12.) Petitioner complains that trial counsel did not interview Ms. Holly M. McClanahan, Esquire, of Princeton, WV, who allegedly drafted . . . a document that purportedly conferred guardianship on petitioner." (Id., p. 12.) Finally, Petitioner alleges that "[d]efense counsel failed to elicit from Mrs. Rowe the fact that she had revoked the Agreement for Guardianship, prepared on November 3, 2000,[6] and replaced it by a new agreement in 2002." (Id., p. 12.)

In his Motion for Summary Judgment, Respondent contends that "Petitioner fails to argue how any further investigation by trial counsel on this issue could have affected the outcome of the proceedings." (Document No. 26, pp. 19 - 21.) Respondent notes that Petitioner's claim "amounts to yet another attack on the jury's determination that Petitioner was the victim's guardian." (Id.)

---

[6] The undersigned notes that the guardianship agreement was dated October 3, 2000. (Document No. 59-1, pp. 36 - 37.)

Respondent contends "there was more than sufficient evidence to support the jury's finding that

Petitioner was J.M.'s guardian" and Petitioner "offers no information or witnesses who would likely

have been sufficient to dispute that evidence." (Id., p. 20.) Respondent contends that "[t]he evidence

clearly supports a finding that any such investigation on this point by trial counsel would have been

fruitless." (Id.) Petitioner did not Respond to Respondent's above argument. (Document No. 81.)

> The State *habeas* court found as follows:
>
> > The trial transcript reveals that Mr. Czarnik did not want to delve too deeply into this
> > issue because he understood [Mrs. Rowe] to be, at best, an unsympathetic witness
> > that even admitted that the Petitioner confessed to having consensual sex with her
> > minor daughter. See Trail Transcript at pp. 168 - 171, 172. Clearly, in light of this
> > testimony, and giving it the deference it deserves, Mr. Czarnik correctly decided not
> > to investigate the Mother's intent for the agreement. See generally State v. LaRock,
> > 196 W.Va. 294, 470 S.E.2d 613 (1996)(citing Burger v. Kemp, 483 U.S. 776, 794
> > (1987))(holding that if a "decision not to mount an all-out [defense] . . . [is]
> > supported by reasonable professional judgment," it is not ineffective assistance). As
> > a result, this ground is without merit.

(Document No. 24-1, Exhibit 6, p. 59.)

The undersigned finds that Petitioner has failed to provide any evidence rebutting the State

*habeas* Court's findings of fact and conclusions of law, which are presumptively correct. The State

*habeas* Court properly applied the standards set forth in Strickland in its determination that counsel

was not ineffective. Decisions concerning what defenses and evidence to present are questions of

strategy for trial counsel. An attorney's strategic decision is presumed reasonable and protected from

second guessing under Strickland. Trial counsel, however, "has a duty to make reasonable

investigations or to make a reasonable decision that makes particular investigations unnecessary."

Strickland, 466 U.S. at 691, 104 S.Ct. at 2066. When trial counsel did not make an investigation, his

decision "must be directly assessed for reasonableness in all the circumstances, applying a heavy

measure of deference to counsel's judgments." Id. In determining the reasonableness of counsel's

actions, consideration may be given to "the defendant's own statements or actions." Id.

Based upon a review of the record, the undersigned finds that trial counsel was not ineffective in failing to more thoroughly investigate the guardianship agreement. First, the undersigned finds that it was irrelevant that Mrs. Rowe was awarded "legal custody" of J.M. The issue at trial was whether Petitioner was the "guardian" of J.M. at the time the abuse occurred. Second, the record reveals that trial counsel did discuss the guardianship agreement with the attorney who prepared it. During trial, out of the presence of the jury, trial counsel informed the court that he "served a subpoena on Holly McClanahan about this document which she did three years ago" and "she had no present recollection of a discussion and intent" concerning the document. (Document No. 25-2, Exhibit 8, p. 10.) Third, the trial transcripts reveal that trial counsel presented evidence that Mrs. Rowe created a second document giving individuals in Las Vegas permission to care for J.M. and G.R. (Id., p. 63.) Mrs. Rowe acknowledged that the second document was only signed by her – not by the individuals in Las Vegas. (Id.) During the omnibus hearing, Mrs. Rowe explained that she "temporarily gave [guardianship] to the Smith's until I could get the children back here." (Document No. 53-1, Exhibit 11, p. 12.) Fourth, trial counsel inquired as to whether Mrs. Rowe intended the guardianship document involving Petitioner "to be used anyplace other than North Carolina" and Mrs. Rowe responded "[a]ctually, no, that was the only place they were supposed to live when they left." (Document No. 25-2, Exhibit 8, pp. 62 - 63.) During the omnibus hearing, Mrs. Rowe verified that she intended the document to give Petitioner "guardianship" "because he would have been [J.M.'s] guardian while she was out of state because she was under age." (Document No. 53-1, Exhibit 11, p. 11.) Finally, trial counsel obtained testimony from Ms. Taylor acknowledging that the guardianship agreement was only signed and

36

notarized by J.M.'s mother – not Petitioner. (Document No. 25-1, Exhibit 8, p. 57.) Thus, there is no evidence that trial counsel failed to obtain exculpatory evidence due to his failure to conduct an adequate investigation of the guardianship agreement. Petitioner fails to demonstrate what the result of a more thorough investigation would have revealed, and how it would have altered the outcome of the verdict. See Bassette v. Thompson, 915 F.2d 932, 940 - 41 (4th Cir. 1990)(an allegation that an attorney conducted an inadequate investigation does not warrant relief absent a proffer of the specific favorable evidence the investigation would have brought out). Accordingly, Respondent is entitled to summary judgment because Petitioner fails to demonstrate how he was prejudiced by trial counsels' failure to conduct a more thorough investigation of the guardianship agreement.

### B.  *Age of Consent.*

Petitioner argues that trial counsel was ineffective in failing to argue that J.M. was the "age of consent" or that his conduct was permissible based upon Lawrence. (Document No. 1, pp. 9 - 12.) Petitioner again argues that the age of consent is sixteen years old pursuant to West Virginia Code § 48-2-301. (Id. ) Petitioner also continues to cite Lawrence arguing that "[i]t is plausible that the right to sexual activity might attach prior to eighteen." (Id.) Petitioner contends that J.M. testified that "she engaged in voluntary sex with Petitioner" and "[t]wo consenting individuals, one being sixteen years of age, may legally engage in sexual relationships in West Virginia." (Id., p. 11.)

In his Motion for Summary Judgment, Respondent argues West Virginia Code § 48-2-301 is an "unrelated domestic statute that creates an age of contest for marriage" and has "no application under the criminal statutes." (Document No. 26, pp. 16 - 17.) Respondent further argues that "Lawrence did not grant children the capacity to have sex with adults nor did it provide for a federal age of consent below the age of majority." (Id.) Petitioner did not file a Response. (Document No. 81.)

As explained above, the undersigned finds Petitioner's challenge to his conviction based upon West Virginia Code § 48-2-301 and Lawrence to be without merit. Thus, trial counsel did not act ineffectively in failing to present arguments based upon West Virginia Code § 48-2-301 and Lawrence. See United States v. Kilmer, 167 F.3d 889, 893 (5th Cir. 1999)(stating that "[a]n attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue"); Moore v. United States, 934 F.Supp. 724, 731 (E.D.Va. 1996)(holding that "there can be no claim of ineffective assistance where, as here, counsel is alleged to have failed to raise a meritless argument"). Therefore, Respondent is entitled to summary judgment regarding the above claim of ineffective assistance of counsel.

## C. *Emancipation.*

Petitioner argues that "J.M. was partially or fully emancipated under the laws of Ohio and Nevada prior to her return to West Virginia in 2002. (Id., p. 10.) Petitioner contends that "[d]efense counsel did not present to the jury a clear and concise chronology of J.M.'s activities after she attainted the age of sixteen and left school." (Id., p. 12.) Petitioner further states that "[d]efense counsel did not identify J.M.'s friends and employers in Nevada during 2001-2002 to substantiate Petitioner's contention that J.M. was emancipated under Nevada law." (Id.)

In his Motion for Summary Judgment Respondent argues that trial counsel had to limit the testimony regarding J.M.'s activities because it would have opened the door to potential uncharged crimes occurring in other states. (Document No. 26, p. 22.) Respondent further notes that Petitioner fails to "argue what evidence surrounding J.M.'s activities during this period would have been beneficial to the defense in light of the potential for prejudice." (Id.) Finally, Respondent notes that

38

J.M. testified that she was not employed while living in Nevada and "Petitioner provides no evidence J.M. was employed in Nevada." (Id., pp. 22 - 23.) Petitioner failed to file a Response regarding the above issue.

*Habeas* petitions must meet heightened pleading requirements. McFarland v. Scott, 512 U.S. 849, 114 S.Ct. 2568, 129 L.Ed.2d 66 (1994). The petition must "set forth in summary form the facts supporting each of the grounds thus specified." Rule 2(c) of the Rules Governing Section 2254 Proceedings in the United States District Courts. "[N]otice pleading is not sufficient [in federal *habeas corpus*], for the petition is expected to state facts that point to a 'real possibility of constitutional error.'" Blackledge v. Allison, 431 U.S. 63, 75 n. 7, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977); also see Bernier v. Moore, 441 F.2d 395, 396 (1st Cir. 1971)(stating that "[t]he fundamental purpose of *habeas corpus* would be undermined if the writ were prostituted by holding it out as available upon mere 'notice' without any showing of entitlement.") The petitioner must come forward with evidence that the claim has merit. Nickerson v. Lee, 971 F.2d 1125 (4th Cir. 1992), cert. denied, 507 U.S. 923, 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993), *abrogation on other grounds recognized*, Yeatts v. Angelone, 166 F.3d 255 (4th Cir. 1999). Unsupported, conclusory allegations do not entitle a petitioner to relief. See Beasley v. Halland, 649 F.Supp. 561, 566 (S.D.W.Va. 1986)(finding that "[m]ere conclusory charges of perjury and the knowing use of perjured testimony is insufficient to warrant a hearing or habeas relief"); Jones v. Gomez, 66 F.3d 199, 204 - 05 (9th Cir. 1995)(stating that "[c]onclusory allegations which are not supported by a statement of specific facts do want warrant habeas relief"). The undersigned finds that Petitioner's above claim of ineffective assistance of counsel is improperly plead. Petitioner merely concludes that trial counsel was ineffective in failing to "identify J.M.'s friends and employers in Nevada during 2001-2002 to

substantiate Petitioner's contention that J.M. was emancipated under Nevada law." Petitioner, however, fails to indicate the names of "J.M.'s friends and employers" or what information they might have provided. Petitioner further concludes that trial counsel was ineffective in failing to "present to the jury a clear and concise chronology of J.M.'s activities after she attainted the age of sixteen." The trial transcripts reveal that J.M. testified on cross examination that after being in Nevada for a short period of time with Petitioner,  she took G.R. and "went to stay with my friend and her parents." (Document No. 25-2, Exhibit 8, p. 35.) Trial counsel obtained testimony from J.M. that she had a car and drove even though she did not have a driver's license. (Id., pp. 36 and 38.) J.M. further stated that while in Nevada she "relocated from place to place" and she considered herself to be "pretty much" own her own for about two or three months. (Id., p. 37 and 41.) Although trial counsel inquired as to whether J.M. obtained employment while in Nevada, J.M. testified that she did not work or earn money. (Id.) J.M. explained that she "just lived on the gracious friends and what money Mr. Rowe would send [her] from time to time." (Id.) Thus, the undersigned finds that Petitioner fails to indicate particular activities J.M. engaged in or the names of "J.M.'s friends and employers," fails to demonstrate what the result of calling them as a witness would have revealed, and how it would have altered the outcome of the verdict. See Bassette, 915 F.2d at 940 - 41(an allegation that an attorney conducted an inadequate investigation does not warrant relief absent a proffer of the specific favorable evidence the investigation would have brought out). Petitioner merely speculates that calling "J.M.'s friends and employers" as witnesses or presenting "a clear and concise chronology of J.M.'s activities after she attainted the age of sixteen" would have convinced the jury of his theory that J.M. was emancipated. Based on the foregoing, the undersigned finds the above claim of ineffective assistance of counsel should be dismissed.

### D. *Alibi Defense.*

Petitioner argues that trial counsel was ineffective in failing to investigate and present an alibi defense. (Document No. 1, pp. 12 - 14.) Specifically, Petitioner contends that "[d]efense counsel did not present to the jury any material and relevant evidence that petitioner was residing in Charlotte, Mecklenburg County, North Carolina, in September, 2002, and, therefore, not present in Mercer County, West Virginia during the period alleged in the indictment." (Id., p. 12.) Petitioner claims that "[d]efense counsel did not interview the individuals who would conclusively establish a viable alibi defense." (Id., p. 13.) Petitioner explains that his "mother recalls petitioner left West Virginia on August 31, 2002, immediately after he pawned items at the EZ Pawn and Sales of Bluewell, WV, for $350." (Id.) Petitioner states that his mother "can attest that when petitioner borrowed the money, petitioner's car was packed and he immediately left the state [and] she did not see petitioner again for two months." (Id.) Petitioner asserts that Doug Mason, owner of the Rock Hill Pawn Shop, can "establish petitioner's presence in South Carolina on September 7 and 11, 2002." (Id.) Petitioner states that "available evidence includes the lease between Steven Hawfield, Lessor-Owner, and David A. Rowe, Lessee, of an apartment at 7949-36 Shady Oak Trial, Charlotte, NC." (Id., p. 14.) Petitioner states that the lease "began on September 12, 2002, and ended on September 30, 2003." (Id.) Petitioner further contends that his step-father, Nathan Belcher, provided an "affidavit in support of petitioner's Motion for New Trial stating that petitioner did not rent an apartment from him in September, 2002, and removed all his belongings from his former apartment prior to September 1, 2002." (Id.)

In his Motion for Summary Judgment, Respondent first argues that "Petitioner has no proof to support an alibi defense." (Document No. 26, p. 22.) Next, Respondent contends that "[i]f he did,

it was his responsibility to provide any credible alibi information to trial counsel." (Id.) Respondent

notes that "Petitioner did not provide any such information at the motion for new trial and claimed

he could not recall details of his whereabouts at the time." (Id., p. 23.) Respondent notes that the

"reasonableness of counsel's actions may be determined or substantially influenced by the

defendant's own statements or actions." (Id., p. 22.) Petitioner did not file a Response concerning

the foregoing. (Document No. 81.)

The State *habeas* court found as follows:

> The Petitioner also alleges that Mr. Czarnik also failed to properly investigate
> the Petitioner's alibi defense that he was in North Carolina at the time the offenses
> occurred. It is the Petitioner's contention that Mr. Czarnik knew he was in North
> Carolina at the time of the offenses charged. However, as established later at the
> Petitioner's Motion for New Trial, the Defendant claimed that he could not
> remember any of the details in reference to his whereabouts in North Carolina in
> September of 2002. Thus, he was in no position to provide Mr. Czarnik with any
> information which could assist in his investigations. As such, courts cannot expect
> defense counsel to blindly investigate everything even without any factual support
> for such investigations. If a "decision not to mount an all-out [defense] . . . [is]
> supported by reasonable professional judgment," it is not ineffective assistance. State
> v. La Rock, 196 W.Va. 294, 470 S.E.2d 613 (1996)(quoting Burger v. Kemp, 483
> U.S. 776, 794, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638, 657 (1987)). "The widespread
> use of the tactic of attacking trial counsel by showing what "might have been" proves
> that nothing is clearer than hindsight – except perhaps the rule that we will not judge
> trial counsel's performance through hindsight." State v. Miller, 194 W.Va. 3, 459
> S.E.2d 114 (1995).
> 
>     The simple fact is that evidence as testified to by the victim, established that
> both she and the Petitioner were living together in Mercer County, West Virginia,
> in September of 2002. See Trail Transcript at pp. 132-137. Accordingly, this ground
> is also without merit.

(Document No. 24-1, Exhibit 6, p. 63.)

The undersigned finds that Petitioner has failed to provide any evidence rebutting the State

*habeas* Court's findings of fact and conclusions of law, which are presumptively correct. The State

*habeas* court properly applied the standards set forth in Strickland in its determination that counsel

was not ineffective. As stated above trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S.Ct. at 2066. When trial counsel did not make an investigation, his decision "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. In determining the reasonableness of counsel's actions, consideration may be given to "the defendant's own statements or actions." Id. In the instant case, there is no evidence that Petitioner indicated to trial counsel that he was not in West Virginia in September, 2002. Petitioner claims that he was unable to inform trial counsel of his alibi defense because he was overwhelmed by the criminal trial. (Document No. 53-1, Exhibit 11, p. 44.) Absent an indication from Petitioner that he was not in West Virginia in September, 2002, trial counsel had to reason to conduct an investigation as to Petitioner's whereabouts.[7] The trial transcripts reveal that J.M. testified that she and Petitioner were residing together in West Virginia in September, 2002. (Document No. 25-2, pp. 25 - 28.) Thus, the undersigned finds that trial counsel did not act unreasonably in failing to investigate whether Petitioner was in West Virginia in September, 2002. Furthermore, decisions concerning what defenses and evidence to present are questions of strategy for trial counsel. An attorney's strategic decision is presumed reasonable and protected from second guessing under Strickland. Based on the foregoing, the undersigned finds that the above claim of

---

[7]   On the first day of trial, trial counsel informed the Court that he anticipated calling Petitioner's mother, Vicki Belcher, as a witness. Trial counsel explained that he had evidence that indicated Petitioner and J.M. "were only [in West Virginia for] part of June." (Document No. 59, p. 55.) Trial counsel, however, found it unnecessary to call Ms. Belcher as a witness because at the conclusion of the State's case in chief, the trial court granted counsel's motion to dismiss the Indictment as to the charges concerning the month of June. If there had been any indication by Petitioner or his mother that Petitioner was not in West Virginia in September, 2002, it is unlikely that trial counsel would have failed to investigate and present such evidence.

ineffective assistance of counsel should be dismissed.

**E.  *Lesser-Included Offense.***

Petitioner argues that trial counsel was ineffective in failing to request a lesser-included offense instruction. (Document No. 1, p. 14.) Specifically, Petitioner contends that "fornication would be a lesser included offense of Sexual Abuse by a Guardian." (Id.) Petitioner states that "fornication is the voluntary sexual intercourse between two unmarried persons." (Id.) In his Motion for Summary Judgment, Respondent states that Petitioner's claim is without merit because "there is no lesser included offense of the crime." (Document 26, p. 25.) "The test of determining whether a particular offense is a lesser included offense is that the lesser offense must be such that it is impossible to commit the greater offense without first having committed the lesser offense. An offense is not a lesser included offense if it requires the inclusion of an element nor required in the great offense." Syllabus Point 1, State v. Neider, 170 W.Va. 662, 295 S.E.2d 902 (1982). The undersigned finds that fornication is not a lesser-included offense of Sexual Abuse by a Guardian, which prohibits sexual intercourse between a guardian and a child. Fornication involves sexual intercourse occurring between two unmarried adults. The undersigned, therefore, finds that Petitioner was not prejudiced by trial counsels' failure to present a non-meritorious argument, and Respondent should be granted summary judgment.

**F.  *Right to Testify.***

Petitioner complains that the trial counsel was ineffective because counsel "remained silent when the court failed to ascertain if petitioner had made a voluntary, intelligent and informed decisions to waive his right to testify" pursuant to State v. Neuman, 179 W.Va. 580, 371 S.E.2d 77 (1988). (Document No. 1, pp. 12 - 13.) Petitioner further states that "counsel did not propose, and

the Circuit Court of Mercer County did not instruct the jury, that the fact that the defendant's failure to testify was not to be considered by the jury as a circumstance showing or tending to show his guilt." (Id., p. 13.)

In his Motion for Summary Judgment, Respondent contends that Petitioner's above claim "is insufficient to merit a response." (Document No. 26, p. 24.) Respondent notes that "Petitioner does not claim that he would have testified if he'd been given a colloquy by the court." (Id.) Respondent further asserts that "Petitioner fails to argue how any further information from the judge would have altered his decision to testify and how such decision prejudiced his defense." (Id.) Petitioner did not file a Response. (Document No. 81.)

Without determining whether trial counsel's performance was deficient, the undersigned finds that Petitioner has not demonstrated that he was prejudiced by counsel's failure to ensure that the trial court advised Petitioner of his right to testify pursuant to State v. Neuman, 179 W.Va. 580, 371 S.E.2d 77 (1988).[8] Petitioner does not allege that he would have testified had the trial court advised him of his right to testify pursuant to State v. Neuman. Further, Petitioner fails to offer evidence as to what testimony he would have presented to the jury and how this testimony would have changed the outcome of the trial. During the omnibus hearing, Petitioner acknowledged that

_____

[8] In *Neuman*, the West Virginia Supreme Court held as follows:

A trial court exercising appropriate judicial concern for the constitutional right to testify should seek to assure that a defendant's waiver is voluntary, knowing, and intelligent by advising the defendant  outside the presence of the jury that he has a right to testify, that if he wants to testify then no one can prevent him from doing so, that if he testifies the prosecution will be allowed to cross-examine him. In connection with the privilege against self-incrimination, the defendant should also be advised that he has a right not to testify and that if he does not testify then the jury can be instructed about that right.

trial counsel advised him not to take the stand. (Document No. 53-1, Exhibit 11, pp. 48 - 49.) Petitioner states that although he wanted to testify, he took the advice of the trial counsel. It is well established that 'the advice provided by a criminal defense lawyer on whether his client should testify is 'a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance.'" Carter v. Lee, 283 F.3d 240, 249 (4th Cir. 2002)(citing Hutchins v. Garrison, 724 F.2d 1425, 1436 (4th Cir. 1983). Next, the undersigned finds that Petitioner does not have a Federal constitutional right to be advised by the court of his right to testify. As stated above Federal *habeas* relief is available only if Petitioner is in custody in violation of the Constitution or laws or treaties of the United States. Under Federal law, there is no affirmative duty of a trial court to advise the defendant of his right to testify. United States v. McMeans, 927 F.2d 162, 163 (4th Cir. 1991); also see State v. Blake, 197 W.Va. 700, 712, 478 S.E.2d 550, 562 (1996)(""[T]he Neuman requirements, like the Miranda warnings, are not constitutional rights themselves but are merely prophylactic standards designed to safeguard the right of every criminal defendant to testify in his or her own behalf."). "To waive the right [to testify], all the defendant needs to know is that a right to testify exists." Id.; also see United States v. Richardson, 195 F.3d 192, 197 - 98 (4th Cir. 1999). A defendant's "trial counsel, not the court, has the primary responsibility for advising the defendant of his right to testify." Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998). In the instant case, there is no indication that Petitioner was not advised by trial counsel of his right to testify. Finally, the record clearly reveals that the trial court instructed the jury that "[t]he fact that the Defendant did not testify as a witness in his own behalf cannot be taken or considered by the jury as any evidence, nor even as a circumstance, showing or tending to show in the slightest degree lack of innocense on

the part of the Defendant."[9] (Document No. 53-2, Exhibit 12, p. 5.) Trial counsel, therefore, was not ineffective in failing to seek such an instruction. Accordingly, the undersigned finds that Petitioner's above claim of ineffective assistance of counsel is without merit, and Respondent should be granted summary judgment.

### G.   *Failure to Request a Mistrial.*

Petitioner contends that trial counsel should have requested a mistrial when J.M. testified that Petitioner had used force when the abuse started. (Document No. 1, p. 12.) In his Motion for Summary Judgment, Respondent argues the above issue should be dismissed because trial counsel objected to the testimony, the trial court sustained the objection, and the trial court instructed the jury to disregard the comment. (Document No. 26, p. 23.) Petitioner failed to file a Response. (Document No. 81.)

The undersigned finds that Petitioner's above claim of ineffective assistance of counsel is without merit. First, the Court finds that trial counsel did not act unreasonably. Following J.M.'s testimony that Petitioner had used force in the past, trial counsel objected and moved to strike the testimony. (Document No. 25-2, Exhibit 8, p. 43.) Next, the undersigned finds that Petitioner was not prejudiced by trial counsel's failure to request a mistrial. The trial court sustained trial counsel's

---

[9]  The trial court instructed the jury as follows (Document No. 53-2, Exhibit 12, p. 5.):

The Defendant has the constitutional right not to testify as a witness in his own behalf. The fact that the Defendant did not testify as a witness in his own behalf cannot be taken or considered by the jury as any evidence, nor even as a circumstance, showing or tending to show in the slightest degree lack of innocence on the part of the Defendant. The Defendant, even though he does not testify in his own behalf, is protected constitutionally by the presumption of innocence and, unless the State by other evidence proves each and every material element of the crime charged beyond a reasonable doubt, it would be your duty to find the Defendant not guilty.

objection and instructed the jury to disregard J.M.'s testimony regarding the use of force. (Id.) It is unlikely that a motion for a mistrial based on the foregoing would have been successful given the brief nature of the testimony and the curative instruction by the trial court. Accordingly, Petitioner has failed to establish either prong of the Strickland analysis and therefore, Respondent is entitled to summary judgment on this claim.

**3.     Admission of Rule 404(b) Evidence:**

Petitioner contends that he "was denied a fair and impartial jury trial as secured by the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States of America by the admission of evidence regarding legal conduct of petitioner and the alleged victim in other jurisdictions." (Document No. 1, p. 15.) Petitioner states that the "decision of the trial court to introduce alleged 404(b) evidence in this case was clearly error, clearly rose to constitutional proportions and, in hindsight, was a significant contributing fact to the conviction of this case." (Id.)

In his Motion for Summary Judgment, Respondent argues that Petitioner's claim should be dismissed as it involves "a claim of trial court error, not a claim of constitutional violation." (Document No. 26, p. 25.) Respondent further states that the above claim is controverted by the record. (Id., pp. 26 - 27.) Respondent notes that the "trial court specifically ruled that no evidence of uncharged crimes would be admitted outside of testimony intrinsic to the development of the facts of the crimes that occurred in West Virginia." (Id.) Respondent argues that "aside from J.M.'s brief testimony about how and when the abuse started, her testimony was limited to crimes that occurred in Mercer County and subject of the indictment." (Id.) Petitioner did not file a Response. (Document No. 81.)

Generally, federal *habeas* relief is available with respect to a trial court's evidentiary rulings,

48

only if the ruling denied the defendant the right to a fair trial. See Abrams v. Barnett, 121 F.3d 1036, 1042 (7th Cir. 1997). When the challenged evidentiary rulings "so infected the entire trial that the resulting conviction violates due process," it is presumed that the defendant was denied a fair trial. Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). The fact that the admitted evidence allegedly was improper under State law, however, does not provide a basis for *habeas* relief. "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438, n. 6, 103 S.Ct. 843, 853, n. 6, 74 L.Ed.2d 646 (1983). The proper inquiry for the Court is whether the admission of the evidence itself so infected the entire trial that the resulting conviction violates due process. See Estelle, 502 U.S. at 72, 112 S.Ct. at 482.

The undersigned finds that the trial court's admission of J.M.'s testimony that Petitioner began abusing her at the age of 14 while they were on a trip outside the State of West Virginia did not deny Petitioner a fundamentally fair trial. Prior to J.M.'s testimony, the trial court ruled that no evidence of uncharged crimes could be admitted outside of testimony intrinsic to the development of the facts of the crimes that occurred in West Virginia and how and when the abuse started. (Document No. 25-1, Exhibit 8, pp. 24 - 30.) The trial transcripts reveal that J.M. testified only as to when and how the abuse first started.  Specifically,  J.M. testified that when she was 14, she and G.R. when on a trip with Petitioner because "he was a truck driver" and "my parents just got separate, so we went on the road with him." (Document No. 25-2, Exhibit 8, p. 20.) J.M. explained that the trip was memorable because it was the first time she performed oral sex on Petitioner. (Id., p. 21 and 23.) J.M. did not testify concerning any uncharged crimes that occurred in South Carolina, Ohio, and Nevada. (Id., pp. 16 - 47.) At the conclusion of J.M.'s testimony, the trial court gave the

following cautionary jury instruction:

> You have heard the evidence concerning alleged conduct or acts of the defendant which are not charged in the indictment in this case. You're instructed that such evidence is not admitted as proof of the defendant's guilt on the present charges.
>
> This evidence is admitted for a limited purpose only, to show the history of the persons in this case, and it may be considered by you only in deciding whether a given issue or element relevant to the present charges has been proven.
>
> In this instance the evidence may not be considered as proof of the charges contained in the indictment. The defendant is not - - is not now being tried for any of the specific acts to which this evidence relates, and you should bear this fact definitely in mind.
>
> Such evidence was admitted and should be considered by you only so far as in your opinion it may go to show the motive, opportunity, intent, preparation, or a plan of the defendant.

(Document No. 25-2, Exhibit 8, pp. 47 - 48.) During the final jury instructions, the trial court again gave the jury the above a cautionary instruction. (Document No. 53-2, Exhibit No. 12, p. 10.) Thus, the undersigned finds that Petitioner was not unduly prejudiced by the admission of J.M.'s testimony so as to render Petitioner's trial fundamentally unfair. Even disregarding the testimony concerning when and how the alleged abuse started, there was adequate evidence to support the jury verdict. Accordingly, the undersigned concludes that Petitioner has failed to establish a denial of a federal right as to the above claim and therefore, the claim should be dismissed.

## **PROPOSAL AND RECOMMENDATION**

The undersigned therefore hereby respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **GRANT** Respondent's Motion for Summary Judgment (Document No. 24.), **DENY** Petitioner's Motion for Summary Judgment (Document No. 80.), and **DISMISS** Petitioner's Petition Under 28 U.S.C. § 2254 for Writ of *Habeas Corpus* By a Person in State Custody (Document No. 1.), and remove this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge David A. Faber. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 45(e) of the Federal Rules of Criminal Procedure, the parties shall have seventeen days (fourteen days, filing of objections and three days, mailing/service) from the date of filing of this Proposed Findings and Recommendation within which to file with the Clerk of this Court, written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Petitioner and to counsel of record.

Date: July 11, 2013.

R. Clarke VanDervort
United States Magistrate Judge